### URIAH FOSTER v. THE STATE.

#### No. 1520.   Decided June 8, 1898.

**1.   Witness—Convict—Competency.**

The party attacking the competency of a witness upon the ground that he has been convicted of a felony must show, by the record or mandate, an affirmance of his conviction in the court of last resort where he has appealed his case. Until there has been an affirmance of the judgment by the court on appeal, where an appeal has been taken by the defendant, he is not incompetent to testify as a witness. Following Jones v. State, 32 Texas Criminal Reports, 135.

**2.   Assault to Murder—Evidence—Use of Means Not Alleged—Res Gestae.**

On a trial for assault with intent to murder, where the indictment alleged that the assault was committed "with a knife, with a piece of iron, and some sharp instrument to the grand jurors unknown;" Held, competent, as part of the res gestae and to show intent, to permit evidence to the effect that defendant also used an ax handle in making the assault; the court, in relation to such testimony having properly instructed the jury, in connection therewith, that they could only convict for an assault made with the weapons or instruments set out in the indictment.

**3.   Same—Evidence Insufficient.**

On a trial for assault to murder, alleged to have been committed with a knife, where the evidence showed that defendant, though he stated that he was going to kill the injured party, and had both a knife and gun with which he might have done so, only cut off a portion of the skin of the prosecutor's penis with the knife; Held, the evidence was insufficient to support a conviction for assault with intent to murder.

APPEAL from the District Court of Fort Bend. Tried below before Hon. T. S. REESE.

Appeal from a conviction for assault with intent to murder; penalty, seven years imprisonment in the penitentiary.

The indictment charged appellant with an assault with intent to murder, committed on the 10th of January, 1898, upon one Ben Robinson,

"with a knife, with a piece of iron, and some sharp instrument to the grand jurors unknown."

The parties to the transaction were half-brothers, and the difficulty seems to have had its origin in the fact that Ben Robinson, the injured party, had eloped with and married the stepdaughter of his half-brother, Uriah Foster, this appellant.

The important facts attendant upon the assault are as stated in the examination in chief of the prosecutor. Of course, this testimony was directly contradicted by the testimony of defendant himself and his witnesses.

Ben Robinson testified: "My name is Ben Robinson. I know Uriah Foster, he is my half-brother; have known him all his life. He is about 45 years old, and I am 54 years old. [Here witness identifies defendant in open court.] He, with his son Ben and John Hill, came to my house on the night of about the 10th of January, 1898, about 9 o'clock, and burst open the door with an ax and run in the house, firing off their guns. I was in bed, and Ben Foster run up to me and grabbed me and commenced hitting me with his fist, and hallooed at his father, and said: 'Here he is—I have got him.' Then Uriah Foster run up to me and commenced beating me with an axhandle that he had brought there with him. I am sure that it was an axhandle. It had a hole in one end with a string run through it. He kept beating me until I was out of my 'senses. Ben kept on beating me with his fists. They cursed and abused me all the time. Finally they dragged me out on the floor and beat me with the axhandle some more. Uriah said he was going to kill me. He kept on saying that. After they had beat me awful bad they made me stand up, and tied my hands behind my back with a grass rope that they brought with them. Then Uriah told me to come outside with him, and jerked me out of the door with a rope. He led me off, down under the hill, and when we got down there he said: 'God damn you, I am going to cut your God damned prick off; give it here. You God damned old son of a bitch, you'll never stick it into Pauline or any other woman again.' I begged him not to do it, and he said: 'Give it here, you God damned old son of a bitch; I am going to cut it off.' Then he pulled it out of my pants and pulled it out straight, and I pulled back, and he cut it with a Barlow knife, and cut every bit of the skin off of it. He pulled the skin out so far that he did not cut the main part of it. When he cut through the skin it flew back, and my penis did not have a bit of skin left on it. He says: 'God damn you, you need not think that's all I am going to do to you. I am going to give you a slow death. I am going off to hunt Paulina now, and when I come back, I am going to punch your eyes out. I am going to kill you, you God damned old son of a bitch.' He went off then, and left Ben Foster to guard me with a shotgun. I stood there, and managed after awhile to work my hands out of the ropes. Then I got to thinking I had rather die right then than to have my eyes poked out, and I thought I would take chances on Ben hitting me, and broke and run. Just before I run I stooped down, like

I was going to pick up an ax that was lying there, and Ben Foster ran off behind a house; then I lighted out for Mr. Ransom's. When Ben run behind the house he says, 'Where the hell you going?' I did not say anything, but kept a-running, and Ben commenced hallooing for his daddy. Uriah came running up there and they started off after me. I flew. They went in the wrong direction to catch me, and I got to Ransom's all right. They came up there then, and said they were going to kill me. But Ransom told them they could not. Then they went off. When they first came in the house they run Paulina off. She went up to Williams' house, and they went up there after her, and got her and took her home with them. This all occurred in Fort Bend County, Texas."

Dr. John L. Dillard testified: "I have just examined the man Ben Robinson. He has a strip of skin, about an inch wide, cut out of the middle of his penis. The wound runs all the way round. The foreskin is still there, and the other skin back of the wound, next the stomach, is still there. It looked like it had been inflicted with a knife while the skin was pulled hard. It would be impossible, in my opinion, to inflict this wound with an ax while two men were scuffling over it. It could be done with an ax, but the skin would have to be pulled or stretched out a good deal. The skin of a man's penis is very elastic and loose, and will stretch a good deal."

Cross-examined: "I say that this wound on Ben Robinson is in the middle of his penis, and does not go all the way around. It had smooth edges, like it was cut with a knife. There is about an inch or an inch and a half of the skin gone. There is plenty of skin left on the end which was not hurt, and it goes all the way round."

Professor Wise testified: "I saw Ben Robinson the next morning after this difficulty, and he was hurt pretty bad. A big piece of skin was cut off his penis, and he had bled a great deal. I went to the house the next morning, and found blood on the bed. It was considerably mussed up. There was blood all over the floor of the house. I went down under the hill and found a puddle of blood and a bloody apron."

*Kirkland & Russell,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of an assault with intent to murder, and his punishment assessed at seven years confinement in the penitentiary; hence this appeal.

On the trial the State introduced Ben Robinson as a witness. Appellant objected to his competency, and introduced against him the record of two convictions, both in the District Court of Fort Bend County, and both for the theft of a mare. One cause (No. 1813) in which witness was convicted and given five years in the penitentiary, and on the final sentence notice of appeal was given. This conviction bore date May 16,

39th Crim. Rep.—26

1884. The other (No. 1890) in which witness was convicted and sentenced for five years in the penitentiary, and gave notice of appeal. This bore date April 6, 1886. The State, in order to qualify said witness, introduced a pardon by the Governor of the State of Texas, and which pardon recited that it was on account of a conviction at the March term of the District Court of Fort Bend County, 1886, for the theft of a mare, and showed that he had served his term of five years. Said pardon was granted, restoring to him the rights of citizenship. Appellant, however, still claimed that the witness was not qualified to testify against him, because no pardon was shown to have been extended in cause No. 1813,—the conviction in 1884. The court overruled this objection, on the ground that the witness Robinson had given notice of appeal in said cause No. 1813, and that, until the appellant showed a final conviction in the court of appeals, said witness was competent to testify. This view appears to be in accord with the opinion of this court in Jones v. State, 32 Texas Criminal Reports, 135, holding that the burden was on the State to show that the witness was incompetent to testify, and that the exhibited record of his conviction was not a final conviction,—did not make a convict; that it showed on its face that he prosecuted an appeal to the Court of Appeals, and the judgment of the lower court could be reversed and remanded, or dismissed, or could be affirmed. If reversed and remanded, or dismissed, there is no question but that the witness would have then been qualified, and only in the event of an affirmance of the judgment and sentence of the lower court was he disqualified to testify. This record evidence should have been produced by the appellant. We would observe, in this connection, that this trial was in the same court in which the conviction of the witness had occurred, and it seems to us that it would have been a very easy matter to have settled this question by producing the mandate of the Court of Appeals.

Appellant objected to certain witnesses testifying that appellant assaulted the prosecutor, Ben Robinson, with an axhandle, on the ground that the specific means of assault set out in the indictment did not allege an assault with an axhandle. This testimony was admitted as a part of the res gestae of the offense alleged in the indictment, and as evidence tending to show the intent of the appellant in making the assault by the use of the means set out in the indictment. We think this was correct. The court adequately instructed the jury on this point, both at the time the testimony was admitted and in his charge. The jury were told that they could only convict appellant, if at all, for the assault made with the weapons or instruments set out in the indictment.

The most serious question in this case is whether the evidence is sufficient to support the conviction. The indictment alleges that the assault with intent to murder was made by cutting said Ben Robinson with a knife, and with a sharp instrument, and by striking him with a piece of iron. The proof utterly fails to show any assault or beating with a piece of iron, and, if the conviction can be permitted to stand at all, it is on

account of the alleged cutting with the knife or some sharp instrument. Now, the only cutting shown is the cutting off of a portion of the skin of the prosecutor's penis with a knife, the appellant declaring at the time that he was going to "cut his p——k off." Now, if we take this proof standing alone, it would appear to negative the idea that he intended to kill him. If he had desired to do that, he could as well have stabbed him as not; for there is no question that he had the means, coupled with the ability, to do so. But he expressly declares his purpose, in connection with his act, which fails to indicate an intent to take his life. If this cutting was anything more than an aggravated assault, it was not with intent to murder, but with intent to maim or disfigure. If we recur to other portions of the testimony, showing what appellant did on that occasion besides the cutting, the evidence serves to still further negative the idea to take life. True, the witness Robinson says that appellant stated he was going to kill him,—was going to take his life by slow death; yet we are not to judge appellant alone by what he said on that occasion, but by what he did as well as by what he said. Appellant was armed with a gun, and his son, accompanying him, was also armed. According to the State's testimony, they drew and presented their guns on prosecutor. He testified that they could have shot him if they had desired. He also testified that they beat him unmercifully with an axhandle. We have seen before, however, that he could not be convicted for an assault with intent to murder by either the axhandle or the guns, unless the guns had been used as clubs, and they were not, because the assault was not alleged to have been committed with these instruments, and this evidence was only adduced in order to show the intent of the appellant in making the assault and battery with the knife. We have already seen that the assault with the knife was not with intent to take life, but with another intent; and the fact that on that occasion appellant and his son had deadly weakons, to wit, guns, with which they could have readily slain the prosecutor, it occurs to us is pregnant evidence that they did not intend by what they did to take his life. Because, in our opinion, the evidence is wholly insufficient to support the verdict, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Hurt, Presiding Judge, absent.